UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                          Chapter 7
John D. Hemken and
Kathleen A. Hemken,                            Case No. 13-25399-svk
                         Debtors.

Wan Ho Industrial Co., Ltd.,

                         Plaintiff,
v.                                             Adv. No. 13-2550

John D. Hemken and
Kathleen A. Hemken,

                         Defendants.

Towsley's, Inc.,

                         Plaintiff,
v.                                             Adv. No. 13-2546

John D. Hemken,

                         Defendant.

**MEMORANDUM DECISION**

John Hemken (the "Debtor") paid a lot of money for a business selling promotional model equipment such as pint-sized cranes, bulldozers and fire trucks. The business failed, leaving at least two unhappy creditors in its wake. When the Debtor filed bankruptcy, Towsley's, Inc. ("Towsley's") filed a complaint to except the Debtor's debt from discharge under 11 U.S.C. § 523(a)(4) and (a)(6). Wan Ho Industrial Co., Ltd. ("Wan Ho") also filed a

dischargeability complaint against the Debtor and his spouse, Kathleen Hemken,[1] under Bankruptcy Code § 523(a)(2)(A), (a)(4) or (a)(6) and sought to deny the Debtor's discharge under § 727(a)(2), (a)(3), (a)(4)(A), or (a)(6)(A).  The adversary proceedings were consolidated for the purpose of trial.  The parties stipulated to many of the facts and exhibits.

The Court has the authority to enter a final order as these cases involve the Debtor's discharge, a matter which is designated as a "core proceeding" and is at the center of the adjustment of the debtor-creditor relationship.  *See* 28 U.S.C. § 157(b)(2)(J); *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  This Memorandum Decision constitutes the Court's findings of fact and conclusions of law.

## I. Statement of Facts

Between 2003 and 2007, the Debtor was the president and an owner of Towsley's. (Stipulated Facts ("Stip.") ¶ 1.)  One division of Towsley's (the "Model Division") contracted with manufacturers to produce die cast models that Towsley's sold to distributors for resale. (Stip. ¶ 2.)  The models are "museum quality die cast replicas used primarily for marketing by manufacturers of construction, mining and specialty trucking equipment and fire and rescue vehicles."  (Pls.' Ex. 36.)  In 2007, the Debtor decided to purchase the Model Division, and on May 7, 2007, he formed TWH Acquisition Co. ("Acquisition Co.") for this purpose; shortly thereafter TWH Acquisition Co. changed its name to TWH Collectibles, Inc. ("Collectibles, Inc.").[2]  (Stip. ¶¶ 4, 9.)

---

[1] Although Wan Ho named her as a Defendant and she testified as a witness at the trial, there was no evidence that Kathleen Hemken was involved in the allegedly fraudulent transactions at issue here.  Any claims against her should be dismissed.

[2] Six days after the sale of the Model Division, on June 14, 2007, Acquisition Co. changed its name to Collectibles, Inc.  Both Towsley's and the Bank were aware of the name change as the Debt and Lien Subordination Agreement signed by the Bank and Towsley's on June 8, 2007, notes that Acquisition Co. is "to be known as TWH Collectibles, Inc."  (Def.'s Ex. 2.)

2

To finance the purchase, Acquisition Co. obtained a loan in the amount of $2,600,000 from Nicolet National Bank (the "Bank") secured by a general business security agreement. (Stip. ¶ 8; Testimony of Debtor.)  Although the Bank's security interest included a lien on the tooling used to manufacture the models, the Bank never perfected its security interest on the tooling, as it was located in China.  (Testimony of Bank vice-president Michael Vogel.)  The financing from the Bank was insufficient to complete the sale, and Acquisition Co. also financed a portion of the purchase price with a promissory note and general business security agreement in favor of Towsley's.  (Pls.' Ex. 2, 3.)  To confirm their respective lien priorities, the Bank and Towsley's executed a subordination agreement under which Towsley's security interest was subordinated to the Bank's interest.  (Def.'s Ex. 2.)  On the date of the sale, the Debtor's company took possession of Towsley's model inventory and acquired ownership of the tooling used to manufacture the models.  (Stip. ¶ 5.)  However, Wan Ho, the manufacturer of the models, at all times retained physical possession of the tooling in China.  (*Id.*)

The Debtor lacked legal training and financial expertise, and he traveled often, including to China.  Accordingly, he relied on Patricia Roth, a co-owner and chief financial officer of the business, as well as Karen Monfre, a certified public accountant with Wipfli LLP, Inc., in making and carrying out the financial decisions for the business.  On the advice of Ms. Monfre, and with the assistance of Ms. Roth and Attorney Adrian Ulatowski, on March 24, 2008, the Debtor engaged in a corporate restructuring for tax savings purposes.[3]  The corporate restructuring created a new entity, TWH Collectibles, LLC ("Collectibles LLC"), for the purpose of owning and operating the Model Division purchased from Towsley's.  (Stip. ¶ 15.)  Despite

_____

[3] The record indicates that the name of TWH Collectibles, Inc. was changed to TBL Business Development, Inc., and that TBL Business Development LLC was converted to TBL Real Estate LLC. (Stip. ¶¶ 12, 14.)

3

the name change, the Debtor testified that he and all of the creditors continued to deal with the business as if nothing had changed, and, thus, he did not understand the significance of the name change at the time. Other than the change from Acquisition Co. to Collectibles, Inc., neither the Bank nor Towsley's was notified of the corporate name changes at the time they took place.[4] (Stip. ¶¶ 13, 20.)

In 2008, Collectibles LLC began to experience financial distress, and the company was unable to remain current on all its debts. (Stip. ¶ 19.) Testimony at the trial revealed that a large order was returned, causing a significant cash flow shortage. Despite these problems, the Debtor testified that at the end of 2008, the business made a scheduled $600,000 loan repayment to Towsley's. This stretched the company's finances to the limit, and the company defaulted on its loan covenants with the Bank. As a result, pursuant to the subordination agreement, the Bank informed the Debtor orally and by letter dated June 26, 2009, that the company was to discontinue payments to Towsley's. (Def.'s Ex. 51.) The Debtor testified at trial that the correspondence and discussions with the Bank led him to believe that the Bank required him to focus all repayment efforts toward the Bank.

Collectibles LLC was also having problems paying Wan Ho's invoices. (Stip. ¶ 21.) On December 31, 2010, Collectibles LLC and Wan Ho entered into a Settlement Agreement and Mutual Release of Claims, and Collectibles LLC granted Wan Ho a security interest in the tooling in Wan Ho's possession. (Pls.' Ex. 30.) In the settlement agreement, Collectibles LLC represented to Wan Ho that Collectibles LLC owned the tooling (except for certain items that

---

[4] Towsley's learned of the name change from TWH Collectibles, Inc. to TBL Business Development, Inc. in 2011 and amended its UCC-1 filing to identify TBL as the debtor on April 18, 2011. (Stip. ¶ 13.) Towsley's became aware of the existence of Collectibles LLC in 2013, and it filed a UCC-1 financing statement against Collectibles LLC on April 19, 2013. (Stip. ¶ 20.)

4

were expressly excluded as "customer owned tooling"), and that it was free from any liens. (Stip. ¶ 22; Pls.' Ex. 30.)

After the December 2010 settlement agreement, Collectibles LLC made some payments to Wan Ho, and Wan Ho continued to manufacture and sell models to the business. (Stip. ¶ 23.) However, Collectibles LLC was unable to maintain the scheduled payments to Wan Ho, and on January 17, 2012, the parties entered into an Assignment and Forbearance Agreement. (Pls.' Ex. 31.) Under the forbearance agreement, Collectibles LLC assigned ownership of the tooling to Wan Ho, and Collectibles LLC warranted that the tooling "is free from any and all liens and encumbrances." (*Id.* ¶ 2.)

By the fall of 2012, Collectibles LLC was in severe financial distress. The Debtor, Ms. Monfre, and Ms. Roth all testified that they were focused on working through the financial hurdles so that Collectibles LLC could emerge as a profitable entity. Wan Ho was demanding cash for any future orders. The Debtor was regularly meeting with a group of consultants to come up with ideas to save the business. In September 2012, three of these individuals, Mark Radtke, Tim Weyenberg, and Gerald Sevick (the "Investors"), advanced $102,000 to fund Wan Ho purchase orders. (Pls.' Ex. 36.) Pursuant to agreements signed by Collectibles LLC, the Bank, and the Investors, the Investors deposited $102,000 in an account at the Bank, and the Bank provided a letter of credit to Wan Ho. (*Id.*) Collectibles LLC granted the Investors a lien on the models covered by the purchase orders, and the Bank agreed to subordinate its lien on those models to the lien of the Investors. (*Id.*)

Under pressure from the Bank, Collectibles LLC applied for other sources of financing, but the applications were rejected. Ms. Monfre testified about a six-step plan put in place for refinancing the business. One of the steps, which Ms. Monfre testified was her suggestion, was

5

for Collectibles LLC to sell its model inventory. According to Ms. Monfre, maintaining the inventory was a monthly drain, and if Collectibles LLC could switch to a direct sale plan, the business may have been able to turn a profit. Ms. Monfre also testified concerning her numerous meetings and discussions with Towsley's and the Bank. As the CPA for the business, her efforts were directed at achieving debt reductions necessary for the business to survive.

On December 31, 2012, after other marketing efforts failed, Collectibles LLC sold the majority of its model inventory in a bulk sale to MTN Marketing, LLC ("MTN") for $280,000. (Def.'s Ex. 6.) The Debtor, Ms. Monfre, and Ms. Roth all discussed the terms of the proposed sale with the Bank, and the Bank agreed to the sale. (*Id.*) Even though the Bank was owed in excess of $2,500,000 at the time, the Bank agreed to take $180,000 in exchange for releasing its lien on the model inventory. (*Id.*) The remaining $100,000 from the sale was paid to the Investors. (Stip. ¶ 35.) The parties stipulated that the Investors held security interests in assets of Collectibles LLC, but not specifically in the inventory sold to MTN. (*Id.*) The purchase money finance agreements suggest that the Bank agreed that the Investors could be repaid for advancing the money to complete the purchase orders. (Pls.' Ex. 36.) Testimony at trial from both the Debtor and Mr. Weyenberg indicated that the Investors were paid because they were owed money, and the Investors had committed to helping the business move forward in the future. The Debtor testified that he was under the impression that Towsley's could not be paid from the sale, due to the subordination agreement and the Bank's instructions.

In order to sell certain models, Collectibles LLC needed to pay royalties or license fees. The Debtor testified that these licenses became the most valuable assets of the business. In early 2013, a large royalty payment was due to Caterpillar, Inc. Ms. Roth testified that, even though the business bank account did not have sufficient funds, she paid the royalty with the expectation

that an account receivable would be forthcoming. She indicated that the Debtor was out of town, and she made the decision to "float" the royalty payment. When the account receivable was not received when expected, an $80,000 overdraft was created in the business account at Bank First National. In order to cover the overdraft, Collectibles LLC borrowed $53,000 from the Debtor's father-in-law, Mural Adams, on January 31, 2013. (Stip. ¶ 39.) When funds became available, Collectibles LLC repaid the debt on February 11, 2013. (*Id.*) The Debtor testified that Ms. Roth felt responsible, so she agreed to loan the Debtor $35,000 to cover the overdraft. However, her money was not readily available. So on January 31, 2013, the Debtor borrowed $50,000 from his brother, Steven Hemken. (Stip. ¶ 40.) The Debtor called this loan "insurance" to be used to cover the overdraft only if necessary. When he received Ms. Roth's loan, the Debtor repaid his brother on February 22, 2013. Ms. Roth was never repaid, and she is listed on the Debtor's Chapter 7 bankruptcy schedules as an unsecured creditor.

After the sale of the model inventory to MTN, the Debtor continued to try to save the business. In January 2013, the Debtor made one last trip to China to meet with representatives of Wan Ho in an attempt to reach an agreement to maintain a business relationship. The effort failed. Wan Ho sued on the unpaid invoices, and on May 31, 2013, Wan Ho obtained a judgment against Collectibles LLC in the amount of $4,478,813.64. (Pls.' Ex. 29.) As of August 2013, the balance on Towsley's promissory note was $1,160,500.00. (Pls.' Ex. 32.) On April 24, 2013, the Debtor and his wife filed Chapter 7 bankruptcy, listing Towsley's and Wan Ho as unsecured creditors.

## II. <u>Analysis</u>

A bankruptcy discharge is the "cornerstone of the debtor's 'fresh start' in bankruptcy" that enables the debtor to commence his post-bankruptcy life with a clean slate. *Helms v.*

7

*Gangemi (In re Gangemi)*, 291 B.R. 242, 246 (E.D.N.Y. 2003) (quoting *In re Pimpinella*, 133 B.R. 694, 697 (Bankr. E.D.N.Y. 1991). In fact, denying a debtor's discharge "is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor." *Buckeye Ret. Props. of Ind., LLC v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006). Given the importance of the discharge, exceptions to discharge must be "construed strictly against a creditor and liberally in favor of the debtor." *Shaw Steel, Inc. v. Morris (In re Morris)*, 223 F.3d 548, 552 (7th Cir. 2000). The burden is on the creditor to establish each element of the discharge exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The issue is whether Wan Ho or Towsley's has met its burden of proof.

A. <u>11 U.S.C. § 523(a)(2)(A): False Pretenses, False Representation or Actual Fraud</u>

Wan Ho alleges that the Debtor's debt is nondischargeable under Bankruptcy Code § 523(a)(2)(A), excepting from discharge "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . " To succeed on this claim, Wan Ho must prove that: (1) the Debtor obtained money through a material representation that, at the time, the Debtor either knew was false or acted with gross recklessness as to its truth; (2) the Debtor intended to deceive Wan Ho; (3) Wan Ho justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss. If Wan Ho cannot establish one or more of these elements, its claim for nondischargeability will fail. *See, e.g., Field v. Mans*, 516 U.S. 59, 70 (1995); *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995); *In re Mullet*, 817 F.2d 677 (10th Cir. 1987); *Rambush v. Tailford (In re Tailford)*, No. 12-3144, 2014 Bankr. LEXIS 1161, *8-9 (Bankr. N.D. Ohio Mar. 26, 2014).

8

Wan Ho's case hinges on the representations and warranties the Debtor made in the settlement agreement, (Pls.' Ex. 30), and the assignment and forbearance agreement, (Pls.' Ex. 31), that Collectibles LLC owned the tooling free and clear of any liens or encumbrances. (Stip. ¶¶ 15-16.) The Debtor concedes that he did not disclose that, by virtue of security interests granted in 2007, the Bank and Towsley's could claim liens on the tooling.[5]

Assuming that Wan Ho has proven that the Debtor made a materially false representation about the tooling,[6] Wan Ho also must establish that the Debtor subjectively intended to deceive Wan Ho. "A determination of intent to deceive focuses on circumstantial evidence and is generally inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive or cheat the creditor. If there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor." *Buckeye Ret. Co. v. Kakde (In re Kakde)*, 382 B.R. 411, 427 (Bankr. S.D. Ohio 2008) (internal quotations and citations omitted); *see also Rambush v. Tailford, supra,* (debtor's intent to defraud a creditor under § 523(a)(2)(A) is measured by a subjective standard).

At the trial, the Debtor testified that when he agreed to pledge the tooling to Wan Ho, he was acting under the mistaken belief that the Bank did not hold a security interest in the tooling. According to the Debtor, he had been informed by Bank representatives that, based on its physical location in China, the tooling was not collateral that the Bank could repossess. The Bank told the Debtor that the Bank did not assign value to the tooling for the purpose of

---

[5] The parties stipulated that Collectibles, Inc. granted a lien on its assets to the Manitowoc County Development Authority ("MCDA"). There is no evidence that MCDA ever asserted this lien, and Ms. Monfre testified that the MCDA loan was a $10,000 economic development loan that was paid off.

[6] In the forbearance agreement, the Debtor represented to Wan Ho that the tooling was free from any liens and encumbrances. But, just about one year earlier, Collectibles LLC granted a lien on the same tooling to Wan Ho. (Stip. ¶ 21.) As will be shown, none of the creditors with "encumbrances" ever perfected their security interests, implying that the Debtor's statement was not materially false.

9

providing credit. The testimony of Mr. Vogel, a Bank vice-president, corroborated the Debtor's statements that the Bank determined it was not plausible to reclaim the tooling from China and that the Bank had not perfected its lien on the tooling. While Mr. Vogel conceded that the tooling was not worthless, the Bank did not assign any value to the tooling for lending purposes, and Mr. Vogel admitted that the Bank would not have attempted to enforce its lien on the tooling.

The Court notes that in the security agreement, the Debtor was careful to identify and exclude some tooling that was owned by a customer, reinforcing the Debtor's understanding that the rest of the tooling was available to provide as collateral for Wan Ho. (Pls.' Ex. 30.) In e-mail correspondence from the Debtor to Wan Ho on November 17, 2011, the Debtor asked, "What do need me [sic] to do for the tools? Is there some way to make it seem to my investors that it is just like my bank having the security interest on my current inventory? I just do not want to scare off my investors just when they are starting to fund additional projects." (Pls.' Ex. 35.) The Debtor's words reflect that he did not believe that the Bank had a security interest covering the tooling. Although not technically correct, the Court concludes that the Debtor subjectively believed that that the tooling was not encumbered by the Bank's or Towsley's liens, and he understood that Collectibles LLC was free to pledge the tooling to Wan Ho.

Moreover, the parties' actions after the default is further evidence that, while the tooling technically was listed as collateral in the respective security agreements, neither the Bank nor Towsley's expended an ounce of energy to perfect or realize on the liens. This case would be different if, in reliance on the Debtor's representations about the tooling, Wan Ho continued to do business with the Debtor, only to have the Bank or Towsley's swoop in and repossess the tooling. But that is not what happened. Neither the Bank nor Towsley's asserted any claim to

the tooling, and Wan Ho at all times had physical possession and complete control of the tooling. Indeed, Wan Ho's representative, Dennis Sun, testified that Wan Ho is currently contracting with both Towsley's and Buffalo Road Imports ("BRI") to produce models using the tooling. The disposition of the tooling after the Debtor's bankruptcy is evidence that either the Debtor's statements about the tooling were not material misrepresentations, since no claims were made to the tooling, or that Wan Ho did not rely on the Debtor's representations to its detriment.

At closing arguments, Wan Ho cited *In re Gerlach*, 897 F.2d 1048, 1051 (10th Cir. 1990), to support the position that when a false representation leads a creditor to refinance a debt that is in default, the entire debt is nondischargeable. Neither *Gerlach*, nor the Seventh Circuit's decision in *Ojeda v. Goldberg*, 599 F.3d 712 (7th Cir. 2010), is comparable to the facts here. In *Ojeda*, the creditors loaned the debtors $600,000, but when the loan came due on multiple occasions, the debtors were unable to pay. Each time, the parties renegotiated the note. When the debtors filed bankruptcy, the creditors argued that the entire $600,000 loan was nondischargeable because the debtors fraudulently represented that they still owned a McDonald's restaurant in order to induce the creditors to extend the loan.

According to the Seventh Circuit, even though the initial loan involved no fraud, the creditors proved a prima facie case for a fraudulently induced forbearance. *Id.* at 720. To establish such a case, the creditor must prove by a preponderance of the evidence that "(1) it had valuable collection remedies at the time of the misrepresentation, (2) it did not exercise those remedies based upon the misrepresentation, and (3) that the remedies lost value during the extension period." *Id.* at 719. In *Ojeda*, at the time of the forbearance, the debtors did not tell the creditors that they had sold the McDonald's restaurant and that they had mortgaged their house to invest in another restaurant operation. They continued to correspond with the creditors

11

using the McDonald's restaurant stationery. When the debtors filed bankruptcy, the McDonald's restaurant was gone, and the creditors were unlikely to recover anything.

This case is distinguishable because, unlike the McDonald's restaurant, Wan Ho is currently in possession and control of the tooling, apparently free and clear of the Bank's and Towsley's liens. In *Ojeda,* the debtors induced the creditors' forbearance based on the significant value that the restaurant represented in terms of collection remedies. Here, Wan Ho has retained the very collection remedies (ownership of the tooling) that induced Wan Ho to extend further credit to Collectibles LLC in the first place. Unlike in *Ojeda*, Wan Ho did not prove that its collection remedies lost value during the extension period.

The Court concludes that Wan Ho's claim under § 523(a)(2)(A) must fail. The Debtor's alleged misrepresentations about the tooling were not fraudulently made, because the Debtor reasonably believed from discussions with the Bank that the tooling was unencumbered. The Debtor's and the Bank's testimony supports the inference that he did not intend to deceive Wan Ho with his representations about the tooling. On the other side of the coin, Wan Ho entered into two agreements in the space of a year with a financially troubled company. In one of the agreements, Wan Ho took a security interest in the tooling, and in the second agreement, Wan Ho took ownership of the tooling, with the Debtor warranting that there were no liens or encumbrances on the tooling. Wan Ho could not have justifiably relied on that representation, since it knew about its own lien. Neither the Bank nor Towsley's ever asserted their liens on the tooling, and, in fact, Wan Ho is currently using the tooling to produce models for Towsley's. Accordingly, Wan Ho was not damaged in reliance on the Debtor's representations about the tooling.

12

B. <u>11 U.S.C. § 523(a)(4): Fraud or Defalcation while Acting in a Fiduciary Capacity</u>

Section 523(a)(4) of the Bankruptcy Code precludes a debtor from discharging any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In this case, Towsley's alleges that the Debtor committed fraud while acting as a fiduciary for effecting the corporate name changes without notice to Towsley's and for selling the model inventory to MTN at the end of 2012. (Towsley's Compl. ¶ 39.) Wan Ho argues that the Debtor "obtained the full amount of the Wan Ho Debt by this fraud, and therefore the Wan Ho Debt is not dischargeable via 11 U.S.C. § 523(a)(4)." (Wan Ho Compl. ¶ 21.)

To prevail on this claim, Wan Ho and Towsley's must establish "(1) that a trust existed; (2) that the defendant was a fiduciary of that trust; and (3) that the defendant committed 'fraud or defalcation' while acting as a fiduciary of the trust." *Ganther Constr., Inc. v. Ward (In re Ward)*, 417 B.R. 582, 587 (Bankr. E.D. Wis. 2009). See also *Lexington Health Care Ctr. of Elmhurst v. McDade (In re McDade)*, 282 B.R. 650, 658 (Bankr. N.D. Ill. 2002) (first element is establishment of a fiduciary relationship between the debtor and the creditor).

In its closing argument, Towsley's cited *Beloit Liquidating Trust v. Grade*, 2004 WI 39, 270 Wis. 2d 356, 677 N.W.2d 298, for the proposition that officers and directors of an insolvent corporation have a fiduciary duty to creditors. In *Beloit*, a Chapter 11 plan trust created to liquidate the corporation's assets filed suit in Milwaukee County Circuit Court against the corporate officers for alleged mismanagement of the company and breach of fiduciary duty. The circuit court found that no fiduciary duty existed from the officers to the creditors, but a divided Wisconsin Court of Appeals reversed, reasoning that officers and directors of an insolvent corporation do hold a duty to creditors prior to the point at which the corporation actually goes out of business. *Id.* at ¶ 14. The Wisconsin Supreme Court held that "in order for officers and

13

directors to have a fiduciary duty to creditors, a corporation must be both insolvent and no longer a going concern." *Id.* at ¶ 42. It found that Beloit was a going concern during the period within which a claim could be brought, and, thus, no fiduciary duty was owed to the creditors.[7] *Id.*

Towsley's reliance on *Beloit* in the context of § 523(a)(4) is misplaced. The Seventh Circuit Court of Appeals faced a similar argument in *Follett Higher Educ. Group, Inc. v. Berman (In re Berman)*, 629 F.3d 761 (7th Cir. 2011). In that case, the creditor argued that the debtor owed a fiduciary duty to the creditors of his corporation because he was an officer and director of an insolvent corporation. The bankruptcy court found that the creditor had not proved that the corporation was insolvent, so it did not reach the issue. The court of appeals addressed the issue as a matter of law and first noted that: "Not all persons treated as fiduciaries under state law are considered to 'act in a fiduciary capacity' for purposes of federal bankruptcy law. The existence of a fiduciary relationship under § 523(a)(4) is a matter of federal law." *Id.* at 767. Then the court quoted the instruction in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934), that the dischargeability exception's reference to fiduciary capacity is "strict and narrow," and the debtor "must have been a trustee before the wrong and without reference thereto."

The Seventh Circuit Court of Appeals concluded that where a corporation's breach of contract created the debt, the requisite trust is not satisfied. Simply because a corporation becomes insolvent, the obligations to the creditors are not "turned into" ones arising from a trust. "Such obligations are remote from the conventional trust or fiduciary setting, in which someone . . . in whom confidence is reposed is entrusted with another person's money for safekeeping. At least in the absence of fraud, we decline to stretch the § 523(a)(4) exception so far as to make

---

[7] Although the Wisconsin Supreme Court did not expound upon the finding that the company was a going concern, it commented that the officers and directors contended that Beloit Corporation was a going concern because it was "entering into contracts directly related to its product." Id. at ¶ 18.

officers and directors of insolvent corporations personally liable, without the ability to secure discharge in bankruptcy, for a wide range of corporate debts." *Berman*, 629 F.3d at 768 (internal quotations and citations omitted).

In this case, the timing is off. First, the Debtor testified that Collectibles LLC was operating as a going concern after the bulk sale to MTN. The record confirms that Collectibles LLC was paying royalties and operating its business after that transaction. As a going concern, Collectibles LLC did not meet the test established in *Beloit*. Second, the debtor must be acting as a fiduciary to the creditor "at the time the debt was created." Here, the debts to Towsley's and Wan Ho were created long before the bulk sale and other transactions that allegedly constituted defalcations. In short, there is no express trust between the Debtor and the creditors, and § 523(a)(4) does not apply.

C. 11 U.S.C. § 523(a)(6): Willful or Malicious Injury

Towsley's also advanced a claim under Bankruptcy Code § 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[8] Towsley's asserts three main arguments under this provision. First, Towsley's alleges that by changing the names of the entities that pledged collateral to Towsley's, the Debtor caused Towsley's to lose priority in the collateral over other creditors. (Towsley's Compl. ¶ 39.) Second, Towsley's claims that the Debtor sold the model inventory to MTN without the knowledge or consent of Towsley's and then remitted the sale proceeds to third parties. (*Id.*) Third, Towsley's argues that the MTN sale price was substantially less than the value of the collateral. (*Id.*)

---

[8] During closing arguments, Wan Ho conceded the point that it cannot claim conversion for the sale of the model inventory to MTN because it did not hold a secured interest in that collateral.

Secured creditors whose collateral has been disposed of by a debtor may assert nondischargeability claims under § 523(a)(6) based on the theory that the debtor converted the collateral. However, "[u]nless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful and certain to cause financial harm to the creditor, the debt should not be found nondischargeable." *Farmers State Bank v. Diel (In re Diel)*, 277 B.R. 778, 783 (Bankr. D. Kan. 2002). A creditor objecting to the dischargeability of its debt under § 523(a)(6) must prove that the debtor's conduct was both willful and malicious. *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 655 (B.A.P. 10th Cir. 1999).

To be willful, "the debtor must intend that conversion of the collateral injure the creditor or the creditor's lien interest." *Id.* at 657. Willful injury may be established by circumstantial evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that his action will cause a particularized injury. *Id.* Willfulness requires "a deliberate or intentional *injury*, not merely . . . a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). To establish maliciousness, the creditor must prove the debtor acted "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Importantly, the measure of damages for a willful and malicious conversion under § 523(a)(6) is the value of the property that the creditor could have realized upon repossession at the date of conversion. *Fidelity Fin. Servs. v. Cox (In re Cox)*, 243 B.R. 713, 720 (Bankr. N.D. Ill. 2000).

Towsley's did not prove that the Debtor willfully and maliciously injured Towsley's collateral by changing the names of his business. This is not a case where a debtor

16

surreptitiously changed the name of a company in order to run up additional debt to defraud its creditors. The outside accountant, Ms. Monfre, testified that it was her idea to restructure the business to save taxes. The subordination agreement between Towsley's and the Bank acknowledged that the business name would be TWH Collectibles, Inc. During the restructuring, the Model Division assets were transferred to an entity named TWH Collectibles, LLC. The location, all communications with creditors, and the operation of the business continued as if nothing had changed. For example, the name on the bank account was never changed. The logo (TWH Collectibles) did not change. There was no evidence that the name changes and resulting transfer of assets to Collectibles LLC was done with the requisite intent or even that the transfer injured Towsley's. [9]

 Ms. Monfre also took credit for the idea of the bulk sale of the inventory to MTN. That sale did not generate any proceeds for Towsley's. Although Collectibles LLC owed Towsley's about $1,000,000, the company owed the Bank over $2,500,000, and the Bank had the senior security interest on the assets. Under the subordination between Towsley's and the Bank, the Bank informed the Debtor orally and in writing that Collectibles LLC was prohibited from making any further payments to Towsley's. (Def.'s Ex. 51.) The Bank's representatives confirmed this position at the trial, and the Debtor testified that discussions with the Bank led him to believe that he only needed to be concerned with repaying the Bank. Therefore, when Ms. Monfre suggested that he sell the model inventory, he sought only the Bank's approval for

---

[9] Towsley's security interest should have followed the collateral despite the transfer. Section 409.315(1)(a) of the Wisconsin Statutes provides that a security interest continues in collateral notwithstanding the sale or other disposition of the collateral, unless the secured party authorized the transfer. Apparently, Towsley's has filed a lawsuit in Manitowoc County arguing that its security interest is still attached to the model inventory sold to MTN.

17

the sale. Under the circumstances, the Debtor's failure to notify Towsley's of the sale was an understandable oversight, not a willful attempt to injure Towsley's lien rights.

Towsley's argues that the inventory was worth multiple times the price paid by MTN. Brandon Lewis, the owner of BRI, testified that he would have paid $1,600,000 for the inventory. Terry Bosch, owner of Towsley's, indicated that using a "margin-up" analysis based on the production cost, the inventory would be worth approximately $2,250,000. These rosy valuations are in stark contrast to the picture painted by the Debtor and his witnesses. Despite months of trying, the Debtor and his professionals were unable to obtain financing to take out the Bank.

The Debtor testified that he tried to sell the inventory for more, but was rejected. According to the Debtor, Collectibles LLC first began negotiating with MTN to purchase the model inventory beginning in October 2012, with a suggested sale price between $800,000 and $850,000. (Pls.' Ex. 22.) This sale attempt fell through. (*Id.*) Around the same time, the Debtor received an offer to purchase from Cary Francis Group, Inc., valuing the inventory at $310,000. The Debtor testified that this potential buyer was concerned that the inventory was stale and did not know if the company could sell the inventory. This sale also failed. The Debtor revived negotiations with MTN in late December 2012, resulting in the ultimate sale of the model inventory for $280,000. The Bank agreed to the purchase price, even allowing some of the proceeds to be carved out for the Investors. Towsley's evidence of value does not add up. Why would the Debtor sell the collateral for hundreds of thousands of dollars less than it was worth? Why would the Bank approve such a sale? If the inventory had that kind of value, why would Ms. Monfre consider it such a drain on the business that she proposed a bulk sale? It is possible that given more time than the Bank was willing to provide, the inventory may have sold for

more.  But, under the circumstances, the sale price does not evidence that the Debtor willfully and maliciously injured Towsley's collateral.

Towsley's argues that the payment of $100,000 of the purchase price to the Investors amounts to a conversion of Towsley's collateral.  The parties stipulated that the Investors did not hold a security interest in the model inventory that was sold to MTN.  (Stip. ¶ 35.)  However, just a few months before the sale, the Investors had financed a letter of credit for the Bank to provide to Wan Ho.  The Investors' loans directly benefitted Wan Ho and helped Collectibles LLC remain in business.  The Bank acknowledged the importance of the Investors' contributions and agreed that it would subordinate a portion of its lien to the Investors in order to induce the Investors to advance these funds.  (Pls.' Ex. 36.)  Towsley's had agreed with the Bank that its position was fully subordinate to the Bank's position.  According to the Subordinated Nonnegotiable Promissory Note payable to Towsley's:  "This Note and rights to payment hereunder are subordinated to the rights and interest of Maker's primary lender, Nicollet [sic] National Bank."  (Pls.' Ex. 2.)  The subordination agreement between the Bank and Towsley's confirms the Bank's superior position.  The agreement provides:  "Until all Superior Debt is paid in full: . . . [Towsley's] shall not take any action to enforce any liens or demand or accept from the Debtor any payment or collateral to cancel, set off, or otherwise discharge any part of the Subordinated Debt."  (Def.'s Ex. 2.)

The Debtor and Mr. Weyenberg testified that the Investors were paid from the sale because they were owed money from the letter of credit transaction and because of their commitment to continue working with Collectibles LLC to stay in business.  Brad Hutjens, vice president and chief credit officer of the Bank, testified that the Debtor brought the proposal for the sale of the model inventory to the Bank and asked what it would take for the Bank to release

its lien. The Bank was willing to carve out $100,000 from the sale price for the Investors, and under the subordination agreement with Towsley's, was within its rights to do so. In short, by entering into the subordination agreement, Towsley's recognized and agreed that its rights were subordinate to the Bank's. Accordingly, when the Bank agreed that the Investors could be paid from a portion of the sales proceeds, Towsley's was not in a position to object. While Towsley's security interest may have followed the inventory under Wis. Stat. § 409.315(1)(a), the Debtor did not convert Towsley's collateral by arranging with the Bank to allow a portion of the purchase price to be paid to the Investors.

Even assuming a conversion of Towsley's collateral occurred, the law is clear that the measure of damages for a willful and malicious conversion under § 523(a)(6) is the value of the property that the creditor could have realized upon repossession at the date of conversion. *Cox*, 243 B.R. at 720. The highest possible valuation Towsley's suggested for the model inventory was $2,250,000. Even without an adjustment for the costs of sale or the "fire sale" prices normally experienced in a forced liquidation, the value is less than the $2,500,000 owed to the Bank. Since Towsley's could not be paid from the collateral until the Bank was paid in full, Towsley's would not have realized any value from the collateral if the sale to MTN had not occurred. Therefore, Towsley's did not suffer any damages as a result of the Debtor's alleged conversion. In large part due to its agreement to subordinate its rights to the Bank's rights, Towsley's claim for nondischargeability under § 523(a)(6) fails.

D. 11 U.S.C. § 727(a)(2)(A): Transfer of Property with Intent to Hinder, Delay or Defraud

To deny the debtor's discharge under § 727(a)(2)(A), the objector must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the debtor, (3) within one year prior to the bankruptcy filing, (4) with

the intent to hinder, delay, or defraud a creditor. Wan Ho points to two questionable transactions that it contends the Debtor undertook to hinder, delay, or defraud the creditors: the bulk sale to MTN and a settlement with BRI, in which the Debtor attempted to pledge the tooling that he had already pledged to Wan Ho. Wan Ho's claim fails, because neither of these transactions involved property of the Debtor, John Hemken. The property belonged to a separate corporate entity, Collectibles LLC, and that entity is not in bankruptcy. *See*, *e.g., In re Thurman*, 901 F.2d 839, 841 (10th Cir. 1990) ("The words: 'Property of the debtor,' are not the same as 'property in which the debtor has a derivative interest.' To the contrary, the language of the statute is sufficiently circumscriptive to eliminate such an interpretation.").

The bankruptcy court in *BankUnited, N.A. v. Lehmann (In re Lehmann)*, No. 13-0282, 2014 Bankr. LEXIS 2484 (Bankr. M.D. Pa. June 6, 2014), recently considered whether a debtor's actions as an officer of two corporations could support a claim under § 727(a)(2) in the debtor's personal Chapter 7 case. According to the court,

> A debtor who is a shareholder in a corporation will not be denied a discharge based on transfer of or injury to corporate property. The plaintiff has the burden to establish that the property is property of the estate. It is not because the debtor/shareholder is not the owner of property of the corporation. The property interest of the debtor and the debtor's estate is limited to the stock certificates.

*Id.* at *11 (quoting *Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 299 (Bankr. E.D. Pa. 2006). As a result, the court dismissed the § 727(a)(2) allegation for failure to state a claim. Wan Ho's claim should similarly be denied.

E. <u>11 U.S.C. § 727(a)(3): Failing to Keep or Produce Adequate Records</u>

Bankruptcy Code § 727(a)(3) provides that the court shall grant the debtor a discharge unless: "The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the

21

debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." Under this provision, a debtor must keep and produce records and books that allow the court, creditors, and the trustee to construct an accurate picture of the debtor's financial history. *In re Juzwiak*, 89 F.3d 424, 427-28 (7th Cir. 1996). As this Court noted in *Christenson v. Lee (In re Lee)*, 415 B.R. 367, 376 (Bankr. E.D. Wis. 2009):

> In determining whether an individual debtor's records are adequate, the court should assess how a reasonable person would have acted under similar circumstances. *In re Greene*, 202 B.R. 68, 71 (Bankr. D. Md. 1996). This assessment includes a variety of factors, such as: whether the debtor is engaged in business; the complexity and volume of the business; the amount of debt; whether the failure to keep or produce records was the debtor's fault; the debtor's education, business experience and sophistication; customary business practices for recordkeeping in the debtor's business industry; the degree of accuracy disclosed by the existing books and records; the extent of any egregious conduct by the debtor; and the debtor's courtroom demeanor. *See In re Volpert*, 175 B.R. 247, 265 (Bankr. N.D. Ill. 1994) (sufficiency of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's business, the debtor's sophistication, experience, and business acumen).

In *Lee*, the creditor was complaining about the debtor's failure to provide two years of bank records and credit card statements, while Wan Ho is pointing to just one document: a canceled check that Wan Ho requested in discovery. Wan Ho has not cited a case, and the Court's research did not uncover a published decision, in which a debtor's discharge was denied for failure to turn over one document as part of the discovery process.[10]

Prior to the trial, Wan Ho filed three motions to compel discovery of documents. The Court held hearings on the first two motions and ordered a written response on the third motion. The Court granted in part the first motion, determined that the Debtor had complied with the

---

[10] In an unpublished decision, the Ninth Circuit Bankruptcy Appellate Panel noted: "Moreover, failure to produce documents in response to a discovery request, alone, does not justify denial of discharge under § 727(a)(3)." *Salehi v. Global Auto. Group, Inc. (In re Salehi)*, No. EC-13-1171, 2014 Bankr. LEXIS 2649, at *27 (B.A.P. 9th Cir. June 9, 2014).

22

requests that generated the second motion and denied the third motion outright.  It was apparent

that the Debtor's delay in providing discovery documents resulted from several factors, including

that the records were not in the Debtor's possession or control and that computer hardware and

software issues rendered the information inaccessible for a period of time.  (Def.'s Resp. to Wan

Ho's Third Mot. to Compel ("Def.'s Resp.") 2-6.)  Evidence at trial confirmed that the outside

accountant, Ms. Monfre, and the company's chief financial officer, Ms. Roth, maintained the

business records for Collectibles LLC.  The Debtor and Ms. Roth testified that the Debtor had

minimal involvement in the financial operation of the business; he was not in control of the

business records.  Compounding the delay was a series of miscommunications between counsel

for the parties.[11]  According to the Debtor's testimony at trial, all the requested documents

eventually were provided to Wan Ho, including a copy of check number 6741 that was used to

cover an overdraft incurred by Collectibles LLC.  The Court is satisfied that the Debtor

reasonably complied with Wan Ho's discovery requests, and the Debtor's discharge should not

be denied for failing to keep or produce adequate records.  Wan Ho's objection to the Debtor's

discharge on these grounds is denied.

### F. 11 U.S.C. § 727(a)(4)(A): False Oath or Account

Under § 727(a)(4)(A), a debtor's discharge should be denied if the debtor knowingly and

fraudulently made a false oath in connection with the bankruptcy case.  In adjudicating such a

claim, "the objecting party has the burden of proving that (1) the debtor made a false statement

under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the

debtor made the statement with fraudulent intent; and (5) the statement was material to the

---

[11] Wan Ho alleged in its second motion to compel that the Debtor failed to provide bank records from
U.S. Bank; however, it came to light that the documents in question were in the possession of counsel for
Towsley's.  (Def.'s Resp. 5.)

23

bankruptcy case." *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001) (citing *In re Beaubouef*, 966 F.2d 174 (5th Cir. 1992)). Courts recognize that a false oath can include a false statement or omission in the debtor's schedules or statement of financial affairs. *See Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882-83 (B.A.P. 9th Cir. 2005). However, a false oath made inadvertently, under a mistaken belief, or even carelessly is not grounds for denial of discharge. *Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 438 (S.D.N.Y. 1996).

Wan Ho argues that the Debtor knowingly and fraudulently failed to disclose the existence and repayment of two personal loans, including one from his brother, in his statement of financial affairs.[12] Assuming that the Debtor's omissions were material,[13] the question is whether the Debtor omitted the loan repayments with fraudulent intent.

The issue of the Debtor's intent is a question of fact to be answered by this Court based on all the evidence presented and the credibility of the witnesses. *Bank of Miami v. Espino (In re Espino)*, 806 F.2d 1001 (11th Cir. 1986). The Debtor's witnesses all testified about the furious efforts to save the business that came to a head in late 2012 and early 2013. When an overdraft was created in the business account to cover a critically important royalty payment, the Debtor and Ms. Roth scrambled to obtain the money to cover the overdraft. Some of the money came from the Debtor's father-in-law and was deposited in and repaid from the Collectibles LLC

---

[12] Wan Ho also alleged in its Complaint that the Debtor knowingly and fraudulently made a false oath or account by failing to list AAA Promotions, Scott Mertens, Mark Radtke, Gerald Sevick, Tim Wyenberg, and DoAllSer Co. Ltd., on the Debtor's bankruptcy schedules. (Wan Ho Compl. ¶ 48.) Long before trial, the Debtor amended the bankruptcy schedules to include these creditors.

[13] Materiality is broadly defined to include a false statement or omission where direct financial prejudice to a debtor's creditors cannot be demonstrated. *Roberts*, 331 B.R. at 883. "A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Fogal Legwear of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999).

account. There is no requirement for the Debtor to disclose this transaction in his personal bankruptcy. The balance of the money came from Ms. Roth, although the Debtor called on his brother to provide $50,000 as insurance until Ms. Roth was able to fund her loan. When Ms. Roth's money arrived, the Debtor in effect refunded his brother's money and transferred $35,000 to Bank First National to cover the balance of the overdraft. The Debtor testified that since the repayment of the loan to his brother simply "went in and out" of the account, the Debtor did not consider that he was repaying his brother with the Debtor's personal funds. Therefore, the Debtor did not think to disclose the repayment on the statement of financial affairs.

The Debtor's omissions do not rise to the level of fraudulent intent required under § 727(a)(4)(A). Although some of the transactions ran through the Debtor's personal bank account, the testimony was clear that the funds were intended to cover the overdraft incurred by Collectibles LLC. Had the Debtor and Ms. Roth simply deposited all the loans in and made all the repayments from the Collectibles LLC account, none of the transactions would have to be disclosed in the Debtor's personal bankruptcy schedules. By failing to initially list the transactions, the Debtor was not attempting to defraud the trustee or the creditors; he simply did not recognize the need to disclose the "insurance" funds to cover the overdraft. Although Wan Ho insinuated that some harm occurred by the Debtor's transfer of the funds to his brother, the only harm appears to be suffered by Ms. Roth, who loaned the Debtor $35,000 to help cover the overdraft, which she testified she instigated.

The Court concludes that the Debtor's failure to list the loans and repayments to cover the overdraft should not cause the Debtor to lose his discharge. Wan Ho's claim under § 727(a)(4)(A) should be denied.

25

### G. 11 U.S.C. § 727(a)(6)(A): Refusal to Obey Lawful Order of the Court

Section 727(a)(6)(A) of the Bankruptcy Code provides that the court shall not grant a discharge to a debtor who has refused to obey a lawful order of the court. At closing arguments, Wan Ho argued that the Debtor's failure to comply with this Court's orders on Wan Ho's motions to compel satisfies the elements of § 727(a)(6)(A). The Court rejected this claim at the hearing, since the Court found that the Debtor did not "refuse" to comply with the orders. *See, e.g., Smith v. Jordan (In re Jordan)*, 521 F.3d 430, 433 (4th Cir. 2008) (the term is "refused" not "failed"). Moreover, the Court determined that the Debtor ultimately satisfied the discovery requests, as evidenced by the Court's denial of the third motion to compel.[14]

### III. Conclusion

For the reasons stated, Towsley's and Wan Ho have failed to carry their burden of proof. The Court will enter separate orders dismissing the complaints.

Dated: July 16, 2014

By the Court:

Susan V. Kelley
U.S. Bankruptcy Judge

---

[14] Wan Ho also pled 11 U.S.C. § 727(a)(5) in its complaint. This provision denies a discharge to a debtor who fails to explain any loss or deficiency of assets to cover the debtor's liabilities. Wan Ho did not press this claim at the trial, and the Court finds that Wan Ho did not carry its burden of proving this claim.

26